UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:05-00215 |
| | ) | JUDGE CAMPBELL |
| KENNETH CHARLES HENDRIX, | ) | |
| WALTER HENDRIX | ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court are a Motion To Suppress (Docket No. 30), filed by Defendant Kenneth Charles Hendrix; a Motion To Suppress Evidence Seized At 307-B Cleveland Street (Docket No. 40), filed by Defendant Walter Hendrix, Jr.; and a Motion to Suppress Statements Of The Defendant And Evidence Seized From The Defendant's Residence Located At Dahlia Drive In Nashville, Tennessee (Docket No. 41), filed by Defendant Walter Hendrix, Jr. The Court held an evidentiary hearing on the Motions on March 27 and 28, 2006. The parties have now filed supplemental briefs (Docket Nos. 51, 52, 53). For the reasons described herein, the Motions are DENIED.

II. Factual Background

At the evidentiary hearing on the pending Motions, Officer Daniel Walz of the Metro Nashville Police Department testified that as a member of the Department's Special Response Team ("SRT"), a unit of the SWAT team, he participated in the execution of an arrest warrant on Defendant Walter Hendrix, Jr. on November 3, 2005 at 307-B Cleveland Street in Nashville. (Transcript of Suppression Hearing on March 27, 2006, Volume I, at 5-7 (hereinafter "Supp. Transc., Vol. I, at ___")). Officer Walz explained that prior to execution of the warrant, he

determined that Defendant Walter Hendrix had given an address on Dahlia Drive in the past, but that there were active utilities (electricity) in his name on 307-B Cleveland Street. (Supp. Transc., Vol. I, at 7, 25, 50). He also obtained the arrest record and previous mug shots of Defendant Walter Hendrix, and shared those with the other officers who were accompanying him to the scene. (Id., at 8, 10). Defendant Walter Hendrix's arrest history, according to Officer Walz, indicated that from 1995 to 2003, the Defendant had several arrests, including drug possession, weapons possession, especially aggravated kidnaping, and aggravated assault. (Id., at 9).

At approximately 4:30 p.m., Officer Walz testified, several officers went to the Cleveland Street address wearing clothing identifying them as police officers. (Id., at 8, 10). Officer Walz and Officer John Downs went to the front door. (Id., at 11). According to Officer Walz, when the officers approached the door, he noticed that the window next to the door was open, and he could see into the kitchen area of the house. (Id., at 11). Officer Walz testified that he saw a small child sitting at the table and a female standing behind him. (Id.) Officer Walz stated that he knocked on the door, and received no response, then knocked several times and identified himself as a police officer. (Id.) According to Officer Walz, there was no response for one to two minutes. (Id.) Officer Walz testified that the delay in responding caused him concern because he knew the female had seen them, and that the dwelling was small and it would not take one to two minutes to answer the door. (Id., at 12).

After the delay, an individual he later learned was Defendant Kenneth Hendrix came to the door, and stepped outside. (Id.). Officer Walz said, at that time, he was able to see a male subject sitting on the couch, and was still able to see the female. (Id., at 12, 30) Officer Walz

2

testified that he asked the individual who answer the door if he was Walter Hendrix, but he said, "No, Walter is my brother; I am Kenneth Hendrix." (Id.) Officer Walz said that he asked for some identification, and Defendant Kenneth Hendrix stated that he would go back inside to get it. (Id., at 12-13). Officer Walz said that there were similarities between the pictures he had of Defendant Walter Hendrix, Jr. and the appearance of the male who answered the door so that he wanted to verify the identification. (Id., at 13). According to Officer Walz, "I said, Do you mind if we come in with you? He said, That's fine. He gave us consent." (Id., at 13, 53-54).

Officer Walz testified that he and Officer Downs entered the residence, and immediately saw someone standing "somewhat behind the front door." (Id., at 14). Officer Walz said that he immediately identified that person as Defendant Walter Hendrix because he looked like the latest mug shot they had of him. (Id.) Officer Walz then radioed the officers who had gone to the back of the residence that the subject of the arrest warrant was in the house. (Id., at 15, 33). Officer Walz testified that he felt vulnerable at that time because they knew the arrest history of Defendant Walter Hendrix; Mr. Hendrix's brother and another male and a female were in the house; and they did not know if there were other individuals in the areas of the approximately 500 square foot house they could not see. (Id., at 15).

Officer Robert Doak and another officer entered the residence at this time. (Id., at 16-17). Officer Walz testified that Officer Doak then said he would conduct a protective sweep of the residence given the concerns already outlined. (Id., at 16-17, 57-58, 63-64). Meanwhile, Officer Downs conducted a pat-down search of Defendant Walter Hendrix incident to his arrest and placed him in custody. (Id., at 17). Officer Walz accompanied Officer Doak as they entered the first bedroom that was next to the living room. (Id.) Officer Walz then went to the second

3

Case 3:05-cr-00215   Document 54   Filed 05/02/06   Page 3 of 20 PageID #: 373

bedroom and bathroom. (Id., at 17-18). He did not find anyone in those rooms. (Id., at 18). Then Officer Doak told him that he had observed some contraband in plain view in the first bedroom and Officer Walz went there. (Id., at 18). Officer Doak showed him some scales that were sticking out of a Crown Royal bag with a white powdery residue around them that was consistent with cocaine. (Id., at 18, 38). He saw a shotgun leaning against a wall, and a rifle inside the closet. (Id., at 18-19, 39).

At a later time while Officer Walz was in the first bedroom, Defendant Kenneth Hendrix came into the room with Detective Morton. (Id., at 20). Detective Walz testified that Defendant Kenneth Hendrix pointed out certain firearms and drugs that he claimed belonged to him. (Id.)

Officer Robert Doak, another member of the SRT team, testified that he assisted Officer Walz at 307-B Cleveland Street by initially taking a position at the back side of the residence and waiting for contact to be made at the door. (Id., at 66-67). Prior to arrival, he had been briefed as to the physical description and arrest history of Defendant Walter Hendrix, the subject of the arrest warrant, and that the utilities for that address were in his name. (Id., at 67). He also stated that the officers were wearing uniforms identifying them as police officers. (Id., at 77).

After receiving radio contact that the officers in the front of the house had made contact, Officer Doak and Officer Wilder walked around to the front. (Id., at 68, 79). Officer Doak testified that upon entry, he observed that Officer Walz looked concerned and briefly described what they had found when they knocked on the door, including finding Defendant Walter Hendrix behind the door. (Id., at 68, 79). Officer Doak stated that the officers were being "conspicuously ignored." (Id.) At that point, Officer Doak testified, the officers decided to conduct a protective sweep of the residence for their safety. (Id., at 69, 78). Officer Doak

4

testified that they based that decision on Defendant Walter Hendrix's arrest history; the small size of the residence; Defendant Walter Hendrix's presence behind the door upon entry by the officers; and on the behavior of the others in the residence. (Id., at 81, 88).

In the first bedroom, Officer Doak testified that in conducting the protective sweep, he observed the following in plain view: a set of digital scales on the bed; a rifle in the closet; a second set of scales with white powdery reside protruding from a Crown Royal bag on the night stand; and a shotgun laying against the wall next to the window. (Id., at 69-71, 90-91). When he retrieved the scales from the Crown Royal bag, Officer Doak stated, he found a bag that appeared to be cocaine inside the Crown Royal bag. (Id., at 70, 84, 91). At some point, Officer Doak contacted the crime suppression unit, and Officer Darryl Morton and later his sergeant responded. (Id., at 71).

At some later time, officers applied for search warrants for the Cleveland Street address and for the Dahlia Drive address. (Id., at 72-73). Officer Doak was the affiant for both warrants. (Id.)

During the time he was at the Cleveland Street address, Officer Doak testified, Defendant Kenneth Hendrix walked into the first bedroom with Officer Morton and advised the officer as to some cash, marijuana, a pistol and other items. (Id., at 76, 92). According to Officer Doak, Defendant Kenneth Hendrix appeared to be cooperative. (Id.)

Officer Darryl Morton of the Metropolitan Nashville Police Department's Crime Suppression Unit, which investigates narcotics and vice activity, testified that on November 3, 2005, he went to 307-B Cleveland Street at the request of the SRT team. (Id., at 95-96). According to Officer Morton, when he arrived at the scene, he was briefed by Officer Doak, and

5

then interviewed Defendant Kenneth Hendrix. (Id., at 97). Prior to speaking with Defendant Kenneth Hendrix, Officer Morton testified, he advised the Defendant of his Miranda rights. (Id.) Officer Morton testified that Defendant Kenneth Hendrix indicated that he understood his rights and agreed to speak with him. (Id.) At the time, Officer Morton stated, Defendant Kenneth Hendrix was sitting in the rear of a patrol vehicle and the officer spoke to him through the window. (Id., at 98).

According to Officer Morton, after he told Defendant Kenneth Hendrix that a quantity of drugs had been located in a room of the residence and asked if he knew anything about them, the Defendant stated that he wanted to cooperate, and that the marijuana and weapons in the room were his, but that he knew nothing about the cocaine. (Id., at 98). Defendant Kenneth Hendrix also told him that the first bedroom, where the items were found, belonged to him. (Id.) Defendant Kenneth Hendrix indicated that there were additional drugs and weapons in the house that he would point out. (Id., at 98-99, 118). Officer Morton testified that he took Defendant Kenneth Hendrix into the residence, and that he pointed out a quantity of marijuana and a handgun inside a dresser in the first bedroom. (Id., at 99). He also pointed out an SKS assault rifle under the mattress on the bed. (Id.)

Officer Morton testified that he also spoke with Defendant Walter Hendrix. (Id., at 100). According to Officer Morton, he spoke with Defendant Walter Hendrix while the Defendant was sitting in the back of a police SUV. (Id.) He advised Defendant Walter Hendrix of his Miranda rights, Officer Morton stated, and the Defendant indicated he understood his rights and agreed to speak to the officer. (Id., at 100-01). Officer Morton testified that Defendant Walter Hendrix at first denied knowledge of the contraband in the residence, but he told him that his brother had

6

already claimed the marijuana and the guns, but not the cocaine. (Id., at 100-01, 108, 110). Within two to three minutes, according to Officer Morton, Defendant Walter Hendrix claimed ownership of the cocaine that was inside the residence. (Id., at 100-101, 108). Officer Morton stated that Defendant Walter Hendrix asked about his wife, and that he assured the Defendant that his wife, the female inside the residence, was not the target of the investigation. (Id., at 102, 110, 121-22). Officer Morton testified that he did ask Defendant Walter Hendrix why he would allow his wife and kids around the guns and weapons in the house, but also assured him that he was not going to do anything to his wife and kids. (Id.) According to Officer Morton, he never made an agreement with the Defendant that in exchange for a statement, his wife would not be charged. (Id., at 102, 109-10, 112).

Officer Morton testified that he spoke with Defendant Walter Hendrix's wife after advising her of her Miranda rights, and that she told him her husband was self-employed and she knew nothing about the items found in the house. (Id., at 105).

Officer Morton testified that he had been disciplined by the Police Department for filing an inaccurate report, and for abusive treatment. (Id., at 122).

After the Government rested its proof, Defendant Walter Hendrix called Jared Chatman as a witness. (Id., at 123). Mr. Chatman testified that he was at Defendant Kenneth Hendrix's residence on the day the arrest warrant was executed. (Id., at 124). According to Mr. Chatman, both Defendants were at the residence when he arrived, along with Defendant Walter Hendrix's wife, Julie, and two of Defendant Walter Hendrix's children. (Id., at 125). A third child arrived later in the day. (Id.) Mr. Chatman testified that when the police arrived at the residence, he was sitting on a loveseat in the living room playing a video game. (Id., at 125-27). At that time, Mr.

7

Chatman stated, Defendants Kenneth Hendrix and Walter Hendrix were sitting on the couch, with Walter seated closest to the front door. (Id., at 127-29). According to Mr. Chatman, Julie told them that the police were outside, and Defendant Kenneth Hendrix went to open the door. (Id., at 129-30, 144). Defendant Kenneth Hendrix then opened the wood door and the screen door and stepped out onto the porch. (Id., at 130-31). Mr. Chatman testified that when Defendant Kenneth Hendrix opened the door to come back in to get his wallet, an officer grabbed his right arm and put it behind his back. (Id., at 131, 153-55). The Defendant then retrieved his wallet from the top of the television set with his left hand and handed his identification to the officer. (Id., at 131-32). The officers then asked Defendant Walter Hendrix if he was Walter Hendrix, arrested and handcuffed him behind the front door where he had stood up from the couch, and took him outside. (Id., at 132-33, 150-52).

     Mr. Chatman testified that he did not hear the officers ask to enter the house, nor did he hear Defendant Kenneth Hendrix tell them they could come in. (Id., at 132). Mr. Chatman also testified, however, that he did not hear the entire conversation between the officer and Defendant Kenneth Hendrix out on the porch. (Id., at 143).

     Mr. Chatman testified that while he was still seated on the couch, he saw an officer enter the first bedroom, and heard what he described as drawers from the dresser being opened. (Id., at 136-37, 145-47). At some point after that, Mr. Chatman stated, Defendant Kenneth Hendrix told the officers they could see no one was in the house, to which the officer replied: "I can do what I want; we can search this whole house if we want to." (Id., at 137).

     Defendant Walter Hendrix testified that prior to his arrest, his residence was at 1909 Dahlia Drive and he lived there with his wife, Julie, and three children. (Id., at 156-57).

8

Defendant Walter Hendrix testified that he and his family went to stay with his brother on Thursday, November 2, 2005 at 307-B Cleveland Street. (Id., at 157-58, 170). According to the Defendant, he went to his brother's house because he knew there was a probation violation warrant for him, and he wanted to get his affairs in order before being arrested. (Id., at 157-58). He did not believe the police would look for him at his brother's house. (Id.) The electric service was started in his name, the Defendant testified, because his brother had an outstanding balance with the electric company that he would have had to pay off in order to obtain electric service at the Cleveland Street address. (Id., at 158, 177).

On the day the police arrived to execute the arrest warrant, Defendant Walter Hendrix testified, he was sitting on the couch closest to the front door playing video games; his brother was also on the couch; Jared Chatman was on the loveseat; and his wife was in the kitchen. (Id., at 159-160). When his wife told them the police were outside, Defendant Kenneth Hendrix went to the door. (Id., at 160). According to Defendant Walter Hendrix, his brother opened the door and went out on the front porch. (Id., at 161). He testified that he could see the police with a picture of him, and heard Defendant Kenneth Hendrix tell them the picture was not of him, but was of his brother. (Id., at 161). The police then asked Defendant Kenneth Hendrix if he had an identification, and Defendant Kenneth Hendrix told them it was inside. (Id.)

Defendant Walter Hendrix testified that the police grabbed his brother's arm and came in with him when he retrieved his wallet from the top of the television set. (Id., at 161-62). He did not hear the police request consent to enter the house, nor did he hear his brother give such consent. (Id., at 162; Transcript of Suppression Hearing on March 27, 2006, Volume II, at 194-95 (hereinafter "Supp. Transc., Vol. II, at ___")). According to Defendant Walter Hendrix, the

9

officer stuck his head behind the door where the Defendant had stood up and asked Defendant Kenneth Hendrix why he did not tell them that his brother was inside the house. (Id., at 161-62, 175). Defendant Kenneth Hendrix told the officer that he did not give him time to say anything except that the mug shot was not him. (Id., at 162).

At that point, Defendant Walter Hendrix testified, the officers patted him down, handcuffed him, and then went through his pockets. (Id., at 162-63). After a short time, Defendant Walter Hendrix said, he was taken outside and placed in an SUV. (Id., at 163). Defendant Walter Hendrix testified that after approximately twenty minutes, Officer Walz came to the vehicle, asked him if he lived at the Cleveland Street address, and refused to believe him when he said he lived on Dahlia Street instead. (Id., at 163-64). He was then approached by Officer Morton, who Mirandized him at some point, and according to Defendant Walter Hendrix, told him that his brother had claimed ownership of everything in the house except the cocaine. (Id., at 165, 166). Defendant Walter Hendrix testified that Officer Morton told him if he did not find someone to claim the cocaine, the Defendant's wife would go to jail, and his kids would be taken from him. (Id., at 165). The Defendant said that Officer Morton told him he would be charged with child neglect, reckless endangerment, and some other child abuse, and that the children would be placed in DHS custody. (Id., at 165, 167) According to the Defendant, he started crying. (Id.) Defendant Walter Hendrix testified that he asked Officer Morton if they would let his wife and kids go if he told them who owned the cocaine, and when Officer Morton said yes, he admitted the cocaine belonged to him. (Id., at 167). Without the threat to his wife and kids, Defendant Walter Hendrix testified, he would not have admitted that the cocaine belonged to him. (Id., at 167-68).

10

Defendant Walter Hendrix testified that his mother subsequently came by to speak with him and she told him she would take his wife and kids away from the scene. (Id., at 168). The Defendant testified that after an officer told him they were obtaining a search warrant for his residence on Dahlia Drive, and that it would be "harder" on him if they were to find anything, he told the officers the location of firearms and ammunition they would find in the house. (Id., 168-69; Supp. Transc., Vol. II, at 191).

On cross-examination, Defendant Walter Hendrix admitted that he had considerable experience with the criminal justice system. (Id., at 169-70). He testified to convictions for felony drug possession for resale, felony possession of a weapon, possession of a prohibited weapon, possession of cocaine for resale, and simple assault. (Id., at 171-72).

The Defendant explained that he did not want to surrender until Monday because his sister was planning to come down from Detroit over the weekend and take custody of his children. (Id., at 170). He further explained that his wife also had a probation violation warrant, and also planned to surrender on Monday. (Id., at 171).

The Defendants' mother, Marilyn Rogan, testified that she arrived on the scene after receiving a call from Julie, Defendant Walter Hendrix's wife. (Supp. Transc., Vol. II, at 198). She was told by a police officer that her son, Walter, wanted to speak with her, so she went to where he was sitting in an SUV. (Id., at 198-99). Walter told her to have someone feed his dogs, and told her that he had to talk because one of the officers had told him that if he did not, the police were going to arrest his wife and have DHS take custody of the kids. (Id., at 199). Mrs. Rogan testified that she eventually left the scene with Julie and the children. (Id., at 200).

Defendant Kenneth Hendrix testified that he realized the police were at his house, on the

11

day the arrest warrant was executed, when Julie told them the police were outside the window. (Id., at 207). At that point, the Defendant testified, he put the video game he was playing on pause, and stood up and told his brother, Walter, "Come on, let's go outside." (Id., at 207-08). When his brother did not say anything, he went to the door, opened it with his keys, and went out on the porch. (Id.) Defendant Kenneth Hendrix testified that the police asked him if he was Mr. Hendrix, and when he said yes, they showed him a mug shot of his brother and asked if it was him. (Id., at 208). He told them it was not, and they asked him for identification. (Id., at 209). According to Defendant Kenneth Hendrix, he realized he had left his wallet inside on the television set, and told the officers he would go get it. (Id., at 209). The Defendant testified that the officer stopped him, patted him down, then grabbed his hand by the thumb and walked with him into the house. (Id., at 209-211, 227). According to Defendant Kenneth Hendrix the officer did not ask for permission to enter the house, and he did not invite the officer in the house. (Id., at 211).

After entering the house, the officers saw Defendant Walter Hendrix and put him in handcuffs. (Id., at 212-13). The officers told Defendant Kenneth Hendrix to sit on the couch, and at some point, the Defendant heard the officers say they were going to do a protective sweep of the house. (Id., at 213-14). Defendant Kenneth Hendrix testified that when an officer went into his bedroom, he heard the drawers to his dresser and his closet being opened. (Id., at 215). At some point, Defendant Kenneth Hendrix testified, he asked the officer why they were in his room for so long, and he was told, "We can do what we want to do." (Id., at 216).

After the officers moved him outside to a car, Defendant Kenneth Hendrix testified, Officer Morton told him that he had already talked with Defendant Walter Hendrix and that he

12

had claimed ownership of the cocaine. (Id., at 218-19). The Defendant said that Officer Morton told him the police were getting a search warrant and that he would help him if the Defendant pointed out anything else in the house. (Id., at 219). He did not recall whether the officer advised him of his rights. (Id., at 224). Defendant Kenneth Hendrix then went back into the house with Officer Morton. (Id., at 219-20).

In rebuttal, the Government re-called Officer Walz who testified that Defendant Kenneth Hendrix gave him consent to enter the residence, and that he did not grab the Defendant's arm as he walked into the residence. (Id., at 237-38).

### III. Analysis

A. Consent

The Government takes the position that the officers' initial entry into the Cleveland Street residence was based on the consent of Defendant Kenneth Hendrix. The Defendants argue no consent was given, and that no other exception to the warrant requirement applies.

A search conducted without a warrant is per se unreasonable unless it falls within one of the well-established exceptions to the warrant requirement, such as voluntary consent. United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998)(citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The Government has the burden of demonstrating that the consent was freely and voluntarily given. Id. In analyzing whether the Government has met this burden, the Court is to consider the totality of the circumstances of the alleged consent, which may be in the form of words, gesture, or conduct. Id.; United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004).

Officer Walz testified that Defendant Kenneth Hendrix gave consent for the officers to

13

enter the residence when the Defendant turned to go into the house from the porch to retrieve his identification. Although Officer Walz could not recall the exact words, he testified that when he asked the Defendant if he would mind if the officers came in with him, the Defendant said "fine, or that's fine, or something along those lines." (Supp. Transc., Vol. I, at 53-54). Defendant Kenneth Hendrix testified that he did not consent to the entry. Although Jared Chatman and Defendant Walter Hendrix testified that they did not hear Defendant Kenneth Hendrix give consent, both admittedly were inside the residence at the time of the alleged consent.

Having observed the bearing and demeanor of the witnesses, the Court credits the testimony of Officer Walz, and finds that Defendant Kenneth Hendrix gave voluntary consent for the officers to enter his residence.

B. Protective Sweep

The Government contends that its discovery of the contraband inside the Cleveland Street residence took place during a valid protective sweep of the premises. The Defendants argue that the search conducted by the officers was not a valid protective sweep.

In Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the United States Supreme Court considered the practice of conducting a protective sweep of an area to ensure police officer safety when arresting suspects. As described in Buie:

> A 'protective sweep' is a quick and limited search of premises, incident to an arrest, conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding . . . Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

110 S.Ct. at 1098.

14

Thus, in order to justify a protective sweep, officers must "articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." United States v. Biggs, 70 F.3d 913, 915-16 (6th Cir. 1995)(citing Buie, 110 S.Ct. at 1097-98).

In this case, the officers testified that they based the need for the protective sweep on the following factors: (1) the arrest history of Defendant Walter Hendrix, which included weapons possession; (2) the delay in answering the door; (3) Defendant Walter Hendrix's presence behind the door upon entry by the officers; (4) the unusual behavior of the other occupants of the house; and (5) the small size of the residence. Based on this combination of circumstances, the Court finds that the officers reasonably could have believed that the residence harbored an individual who could pose a danger to them.

The Defendants also contend that discovery of contraband in the first bedroom extended beyond any valid protective sweep. Defendants first argue that because Officer Walz left the first bedroom almost immediately after entering, Officer Doak was not justified in further inspection of the room. Officer Walz's testimony, however, indicates that he expected Officer Doak to undertake the inspection in the first bedroom:

> Like I said, the first bedroom is right there in the living room. Just five steps, and you are right into it, not even that probably. That's the first place Officer Doak went. Normally we don't practice one person going into a room at a time. Usually go two people to each room just for officer safety purposes. So I followed him into the first room.
>
> When I saw that there was no – well, what appeared to be no bodies inside immediately, I mean he hadn't checked under the bed and the closet, stuff like that, I turned and went to the second bedroom, and Officer Doak stayed in the first bedroom. I went back there, cleared the second bedroom and the bathroom. That's when Officer Doak stated, you know, he had found some stuff in plain view. . .

15

(Supp. Transc., Vol. I, at 17-18). Officer Walz's exit from the room does not indicate that Officer Doak exceeded the scope of a valid protective sweep.

Defendants also rely on the testimony of Mr. Chatman and Defendant Kenneth Hendrix that they heard a sound like drawers opening in the first bedroom in arguing that Officer Doak exceed the scope of a valid protective sweep. Defendants support this contention by pointing out that Officer Morton testified he was told to come to the scene because officers had found a quantity of marijuana and cocaine. (Supp. Transc., Vol. I, at 113). Because the marijuana was in a dresser drawer and not discovered until Defendant Kenneth Hendrix subsequently pointed it out, Defendants argue, Officer Doak must have looked through the dresser drawers during the protective sweep.

This testimony does not, however, directly conflict with Officer Doak's testimony that he did not look through drawers. None of the witnesses testified that they saw Officer Doak look through dresser drawers. As for Officer Morton's testimony about what someone else told him had been found at the residence, that testimony is not specific or definite enough to undermine Officer Doak's direct testimony. Officer Morton also testified that Defendant Kenneth Hendrix later showed him a quantity of marijuana in the dresser, and that marijuana had not been previously recovered during the protective sweep by Officer Doak. (Id., at 98-99). In addition, Officer Walz testified that he did not recall Officer Doak listing marijuana as one of the items he had found in plain view during the protective search. (Id., at 41). Under these circumstances, the Court is not persuaded that Officer Doak exceeded the scope of the protective search by searching through the dresser drawers.

Defendants also argue that Officer Doak saw the Crown Royal bag after he was satisfied

16

no one was in the room. Thus, Defendants argue, Officer Doak exceeded the scope of a valid protective sweep in observing the bag.[1] The testimony cited by Defendants, however, does not indicate that an extended period of time had expired between the time Officer Doak satisfied himself that there were no other individuals in the room and his observation of the bag. In addition, at the time of the observation, Officer Doak had already discovered contraband in plain view, and was justified in remaining in the room to secure that contraband. See Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); United States v. Taylor, 248 F.3d 506, 512-14 (6th Cir. 2001). Because Officer Doak was legitimately present in the room after the sweep was completed, his observation of the bag in plain view was not invalid.[2]

Defendants also argue that a protective sweep did not justify Officer Doak's removal of the scales from the Crown Royal bag. As observed by Officer Doak, however, the bag had scales protruding from it, and the officer concluded that the scales constituted drug paraphernalia. (Id., at 69-70). As such, the officer was justified in seizing the bag and scales, and inspecting the seized item. Taylor, 248 F.3d at 512.

---

[1] Because Officer Doak was no longer legitimately in the room, Defendants argue, his observation of the bag does not fall within the plain view exception. The plain view exception to the warrant requirement applies when the government shows the following: (1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed; (2) the item is in plain view; and (3) the incriminating character of the evidence is immediately apparent. Taylor, 248 F.3d at 512.

[2] Defendants also argue that there was no urgent need for a protective sweep because Officer Doak obtained identifications from the occupants of the residence before he conducted the protective sweep. The testimony cited by Defendants, however, does not clearly indicate whether identifications were obtained before the sweep or after the sweep, nor does it indicate how long it took to obtain the identifications. (Id., at 80).

17

C. Voluntariness of confessions

    1. Walter Hendrix

Defendant Walter Hendrix argues that his statement to Officer Morton was the result of coercion. It is well established that incriminating statements by a defendant in custody are inadmissible at trial unless the suspect was first advised of his Miranda rights (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). United States v. Salvo, 133 F.3d 943, 948 (6th Cir.1998). A defendant's waiver of his Miranda rights must be voluntary, knowing, and intelligent, based on the totality of the circumstances. Seymour v. Walker, 224 F.3d 542, 554 (6th Cir. 2000). In order for the waiver to be involuntary, there must be "an element of police coercion." Seymour, 224 F.3d at 554.

In determining whether the defendant has been coerced, the court should look to the totality of the circumstances to determine whether the defendant's will was overborne. See, e.g., United States v. Brown, 66 F.3d 124, 126 (6th Cir. 1996). Factors to consider in making that determination include: the age, education and intelligence of the defendant; whether the defendant has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. See, e.g., Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994). Defendant Walter Hendrix testified that he agreed to cooperate with Officer Morton only after Officer Morton threatened to arrest his wife and put his children in state custody. Officer Morton denied making this statement, and by contrast, testified that he told the Defendant his wife was not a target of the investigation. Having viewed the demeanor of both Officer Morton and Defendant Walter Hendrix, the Court credits the testimony of Officer

18

Morton.

Even if the Court disregards the testimony of Officer Morton, however, Defendant Walter Hendrix has not established that his will was overborne by any threat to arrest his wife and place his children in custody. Defendant Walter Hendrix had considerable experience with the criminal justice system and would not be easily intimidated. More importantly, Defendant Walter Hendrix testified that his wife was the subject of a probation violation warrant, and was planning to surrender to authorities in a few days after his sister took custody of the children. Therefore, the Defendant knew the arrest of his wife, and change of custody for his children, were a very real possibility before any alleged threat made by Officer Morton. See United States v. Johnson, 351 F.3d 254, 262-63 (6th Cir. 2003)(Police were not coercive in threatening to arrest defendant's sister when they had probable cause to do so). Accordingly, the Court concludes that Defendant Walter Hendrix statements were not made involuntarily, and are not subject to suppression.

Having reached this conclusion, the Court also rejects Defendant's argument that the search warrants obtained based on his statements should be suppressed as fruit of the involuntary statements.

   2. Kenneth Hendrix

In his Motion, Defendant Kenneth Hendrix argues that his statements to the police should be suppressed because they were made involuntarily. In his post-hearing brief, the Defendant contends that his statements should be suppressed as fruit of an illegal entry and search of the Cleveland Street residence. As the Court has held that the initial entry and discovery of contraband was not invalid, the latter argument is rejected. In addition, the Court finds no basis

19

on this factual record to conclude that the Defendant's statements were made involuntarily.

## IV. Conclusion

For the reasons set forth above, the Court concludes that the initial entry and subsequent discovery of contraband at 307-B Cleveland Street was not invalid, and the statements made by the Defendants were not involuntary. Therefore, search warrants issued based on that information are not invalid. Accordingly, Defendants' motions to suppress are denied.

This case remains set for a pretrial conference on June 2, 2006, and trial on June 13, 2006.

It is so ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

20

Case 3:05-cr-00215   Document 54   Filed 05/02/06   Page 20 of 20 PageID #: 390